Thompson Wire Company v. Commissioner.
Thompson Wire Co. v. Commissioner
Docket No. 2667.
United States Tax Court
1945 Tax Ct. Memo LEXIS 303; 4 T.C.M. (CCH) 205; T.C.M. (RIA) 45067; February 9, 1945
Joseph N. Welch, Esq., and Virgil C. Brink, Esq., 60 State St., Boston, Mass., for the petitioner. Carl A. Stutsman, Jr., Esq., for the respondent. SMITH Memorandum Opinion SMITH, Judge: The respondent determined deficiencies in tax against the petitioner for the years 1940 and 1941 as follows: Deficiency
Declared Value
Excess
Income
Excess
Profits
Year
Tax
Profits Tax
Tax
1940
$10,713.57
$6,788.56
$13,667.55
1941
11,737.42
5,764.23
56,008.72
The petitioner alleges that the respondent erred in his determination of deficiencies by disallowing the deduction from gross income of 1940 of $58,160 and for 1941 $84,000 as amounts paid to two of its officers in excess of reasonable compensation for services rendered. [The Facts] The petitioner is a Massachusetts *304 corporation with its principal office at Mattapan, Boston. It has always filed its tax returns with the collector at Boston. In its returns for 1940 and 1941 it claimed the deduction from gross income for compensation paid its president and treasurer as follows: 1940
1941
George M. Thompson, president
$72,500
$100,000
Barton J. Thompson, treasurer
72,500
74,000
The respondent determined that these payments were in excess of reasonable amounts for services rendered and disallowed $7,500 and $35,000 of the deductions claimed for the president and of $50,660 and $49,000, respectively, claimed for the treasurer, and determined deficiencies accordingly. The petitioner was incorporated on January 3, 1923, with a capital stock of $300,000 divided into 3,000 shares of $100 par value. It received $300,000 cash for its shares. This is the entire amount of capital ever paid in by its stockholders except for an issue of preferred stock in about 1925, which was retired out of earnings within about five years. The company paid a 200 percent stock dividend in 1933 which increased the number of shares outstanding to 9,000. In December, 1931, George M. Thompson created *305 a trust, making his son sole beneficiary. George M. Thompson and his personal attorney, Virgil C. Brink, were co-trustees of this trust from the time of its creation to 1936, when Laura Thompson, wife of George M. Thompson, succeeded her husband. Laura Thompson and Virgil C. Brink were the co-trustees of this trust during 1940 and 1941. George M. Thompson transferred to the trustees 1,582 shares, a majority of the 3,000 shares of the petitioner's stock outstanding. The trust instrument expressly provided that the trustees would have the same power of disposition and management over the trust property as though they were the absolute owners thereof and further provided that the trustees could vote for the election of George M. Thompson to any office of the petitioner company and could fix his salary in such office. Virgil C. Brink at all times relevant herein has been the personal attorney for George M. Thompson, attorney for the Thompson Wire Co., and attorney for the aforesaid trust. Amendments were made to the trust instrument from time to time. In 1936 Laura Thompson was made a beneficiary of the trust. During the years 1940 and 1941 the 9,000 shares of stock of the petitioner *306 were owned as follows: 4,746
shares by trustees for members of George
M. Thompson's family
303
shares by George M. Thompson
100
shares by Barton J. Thompson
3,851
shares by 8 or 9 individuals not related
to the Thompson family
The petitioner is a manufacturer of steel wire and cold rolled strip steel. George M. Thompson was responsible for its organization. He furnished more than 50 percent of the cash capital and has always been its president. He has always dictated its policies, determined the amount of compensation to be paid to its officers and other employees, and managed the corporation as absolutely as he would have managed the business as sole proprietor thereof. George M. Thompson has been engaged in the steel wire and cold rolled strip steel business all of his life. He went to work as a common laborer drawing wire in 1894 at the age of 17 in a wire mill in Worcester, Mass. In 1919 he was superintendent and general manager of the Spencer Wire Co., at Worcester, at a salary of $50,000 per year. That company was merged with the Clinton-Wright Wireco. and soon Thompson became president of that company. Upon a further merger of companies in about *307 1920 Thompson became vice-president and general manager of the Wickwire Spencer Steel Co. at a salary of $35,000 per year, but with a promise that his salary would soon be increased to $50,000 per year. Thompson had for several years desired to form a new company which would be built and managed according to his own ideas. He accordingly resigned his position with the Wickwire Spencer Steel Co. in 1922, and, with a number of friends who had confidence, in his ability, organized the petitioner corporation in 1923. The petitioner built its first plant at Mattapan, Mass. This was completed in 1923. Within a year or two Ashworth Bros. Co., of Fall River, Mass., a large consumer of steel wire, desired to purchase its requirements from the petitioner. In order that the petitioner might manufacture such wire it was necessary to build a second mill. Ashworth Bros. Co. agreed to buy an issue of preferred stock of the petitioner redeemable at 105 to enable the petitioner to build such a mill. Acceding to the wishes of Ashworth Bros. Co., the petitioner built a second wire mill at Worcester in 1925. This mill was built according to plans and specifications furnished by Thompson. The preferred *308 stock issued was retired out of profits from the business within a period of about five years. Thompson had had it in mind for a number of years to build a wire mill in Chicago, or in that vicinity. This plan was put into effect in 1937 when the construction of such a mill was started at or near Chicago. The plant got into production in a small way in 1938. It was later enlarged. The full benefit of this plant to the petitioner was not realized until 1940 and 1941. This plant was also built according to plans and specifications furnished by Thompson. The construction and operation of this plant added greatly to the duties and responsibilities of Thompson. George M. Thompson knew the steel wire and cold rolled strip steel business from the ground up. By his inventive genius he has enabled the petitioner company to develop many new processes and many new products which have proved highly profitable. He has, to a very material degree, been responsible for the petitioner's highly profitable operations during the years. William B. Durkee, the executive vice-president of the petitioner during the taxable years, joined the company in 1926. He has been a full-time employee since that *309 date. From 1916 to 1926 he had been a manufacturers' agent in Boston selling products of various steel and wire companies, including some of those of the petitioner. Durkee was requested by George M. Thompson to come to work for the petitioner company in 1926 in order to devote his entire time to its sales as sales manager. Durkee had studied metallurgy and was sent abroad by George M. Thompson to study the steel industry in Europe. Shortly after Durkee went to work for the petitioner he was able, through his knowledge of the steel business, to suggest a change in the manufacturing methods of the company which resulted in a substantial saving in petitioner's manufacturing costs and resulted in securing the sales of steel shanks to be used in the manufacture of shoes by shoe manufacturing companies. In addition to selling, Durkee was engaged in handling labor matters, priorities, contracts, renegotiations and kindred matters. Although Durkee's position in the early years of his employment was principally in connection with the sale of petitioner's products, his time was more and more taken up with executive and administrative matters. In 1936 he was made executive vice-president. *310 In the absence of George M. Thompson from the plant he acted as chief executive, referring only important matters to George M. Thompson for solution. At the beginning of his employment Durkee was paid a salary of $7,200 per year. By 1931 his salary was increased to $10,000 per year. In 1940 he received a salary of $21,840. In 1941 he received a basic salary of $11,864.50 and an annuity policy which cost the petitioner $19,975, making his total compensation for 1941 $31,840.50. George M. Thompson has only one descendant, a son, Barton J. Thompson, who was born in 1908. He was graduated from Norwich University, Vt., with a degree of B.S. He had never had any acquaintance with the wire products business prior to his graduation and had taken no course in college which particularly fitted him for employment by the petitioner. Shortly after his graduation in 1932 Barton was employed by the petitioner corporation as a salesman. His education as salesman was by his father and by Durkee who still continued to sell to the trade many years after the employment of Barton and worked with Barton on the sales end. Barton proved to be a natural-born salesman. He had tact and ability. He was *311 introduced to the petitioner's customers both by his father and by Durkee and he succeeded in securing some new customers. He also was utilized as credit man and was helpful in solving certain labor problems. The compensation paid by he petitioner to George M. Thompson and Barton J. Thompson from the beginning of the petitioner's business was as follows: George M.
Barton J.
Year
Thompson
Thompson
1923
1924
$ 7,600
1925
12,000
1926
12,000
1927
13,500
1928
25,000
1929
25,000
1930
50,000
1931
43,060
1932
32,870
$ 550
1933
32,740
7,050
1934
37,740
39,300
1935
55,000
57,225
1936
60,086
60,043
1937
65,014
65,032
1938
45,000
45,000
1939
65,000
65,000
1940
72,500
72,500
1941
100,000
74,000
The petitioner had only three key employees during the years 1940 and 1941. They were George M. Thompson, Barton J. Thompson, and William B. Durkee. Except for these three men the petitioner had no personnel manager, no credit manager, no comptroller, no labor relations manager, and no advertising manager. On February 4, 1936, the petitioner's board of directors passed the following resolution: "Upon motion duly made and seconded, *312 it was "VOTED that until further vote of the Board of Directors, the corporation pay to the president and treasurer each as compensation for his services, a salary of $25,000 per year, payable monthly." From that time forward the petitioner adopted the policy of treating these salaries as basic salaries only, voting additional compensation to the president and treasurer, together with other key employees toward the end of the year when dividends were to be voted. During the taxable years the petitioner's board of directors consisted of George M. Thompson, Barton J. Thompson, and Laura Thompson, wife of George M. Thompson. The net income of the petitioner and the dividends paid for the years 1934 to 1941, inclusive, as shown by the income tax return received in evidence, are as follows: Year
Net Income
Dividends
1934
$148,080.77
$ 54,000
1935
212,574.61
1936
232,127.94
108,000
1937
280,086.77
108,000
1938
75,245.07
27,000
1939
285,013.69
54,000
1940
447,981.86
108,000
1941
987,701.15
161,550
Dividends paid in 1940 and 1941 were at the rate of $12 and $18 per share upon the 9,000 shares of stock outstanding. The capital stock plus *313 the earned surplus at the close of 1939 was $1,879,486.43; 1940 $2,189,697.42; 1941 $2,845,568.91. Most of the stockholders of the petitioner corporation in 1941 were also the stockholders in 1923 (except for the creation of the trust, as above indicated). Upon each $100 invested in the stock in 1923 the stockholder received dividends $207of in cash from 1934 to 1941 and his original investment of $100 had grown to have a book value of $948.52 at the close of 1941. Reasonable compensation for the salary of George M. Thompson for the years 1940 and 1941 was $72,500 and $100,000, respectively; reasonable compensation for services rendered by Barton J. Thompson was $25,000 for each of the years 1940 and 1941. The sole question in issue in this proceeding is the right of the petitioner to deduct from gross income for the years 1940 and 1941 a part of the amounts paid out to the petitioner's president and treasurer as compensation for services actually rendered. The disallowances made by the respondent are explained in the notice of deficiency as follows: Year Ended December 31, 1940 (b) Officers' compensation disallowed $58,160.00 The deduction of $166,840.00 claimed under *314 line 15, page 1, of your 1940 return (Form 1120) on account of compensation to officers has been disallowed to the extent of $58,160.00 as shown in the following tabulation for the reason that the amounts paid to your president and treasurer are unreasonable. Compensa-
Time
Amount
tion
Dis-
Name of Officer
Title
Devoted
Claimed
Allowed
allowed
George M. Thompson
President
Part
$ 72,500.00
$ 65,000.00
$ 7,500.00
Barton J. Thompson
Treasurer
Entire
72,500.00
21,840.00
50,660.00
William B. Durkee
Vice-pres.
Entire
21,840.00
21,840.00
Totals
$166,840.00
$108,680.00
$58,160.00
Mr. George M. Thompson, the president and founder of your corporation is allowed the same salary as taken and allowed in the year 1939, which was $65,000.00, and this amount is considered reasonable and commensurate with salaries paid in like businesses. The capital stock of your company is controlled by your president, George M. Thompson and his son, Barton J. Thompson. In connection with the adjustment of the salary paid to Barton J. Thompson, it would seem unreasonable to consider his services to your company as having a value in excess *315 of that of Mr. William B. Durkee, the vice-president, whose salary is limited to $21,840.00 in this year and on a comparative basis this same allowance to Barton J. Thompson is considered very liberal. Barton J. Thompson is the son of your president, George M. Thompson. Information on file in this office indicates that he is about thirty-six years of age, unmarried, and was graduated from Norwich Military Academy. It appears that his father took him into the plant about 1933. Mr. Durkee, the vice-president and sales manager, is approximately fifty-five years of age. He is experienced in the manufacturing and selling of your products, having devoted his entire life to this line of work, and received, $21,840.00 compensation in the year 1940. It is the opinion of this office that the amount of $21,840.00 compensation allowed to Barton J. Thompson is very liberal and the excess amount is due to relationship of father and son and in reality constitutes distribution of profits in disguise. Year Ended December 31, 1941 (c) Officers' compensation disallowed $84,000.00 The deduction of $185,864.50 claimed under line 15, page 1, of your 1941 return (Form 1120) on account of compensation *316 to officers has been disallowed to the extent of $84,000.00 as shown in the following tabulation for the reason that the salaries and bonuses paid to your president and treasurer are unreasonable. Compensa-
Time
Amount
tion
Dis-
Name of Officer
Title
Devoted
Claimed
Allowed
allowed
George M. Thompson
President
Part
$100,000.00
$ 65,000.00
$35,000.00
Barton J. Thompson
Treasurer
Entire
74,000.00
25,000.00
49,000.00
William B. Durkee
Vice-pres.
Entire
11,864.50
11,864.50
Totals
$185,864.50
$101,864.50
$84,000.00
The compensation of $65,000.00 allowed to your president, George M. Thompson, is the same as allowed in this statement for the year 1940. It is the opinion of this office that the amount claimed in your return of $100,000.00, representing salary of $25,000.00 and bonus of $75,000.00 is extraordinarily high in view of the fact that he devotes part time to the business. The capital stock of your corporation is controlled by George M. Thompson and his family. In the case of Barton J. Thompson, the salary of $25,000.00 and bonus of $49,000.00 or a total of $74,000.00 is considered excessive and that family *317 consideration has influenced the amount paid. It is the opinion of this office that the salary and bonus of $74,000.00 would not be paid Although the petitioner's tax returns reported that its president, Georg to officers in other corporations for like services, and under like circumstances. Although the petitioner's tax returns reported that its oresudent, Geirgee M. Thompson, devoted only part of his time to his duties as president, the evidence shows that he devoted his entire time to such duties. Because of a respiratory condition he could not live in the New England climate during the winter months. For a number of years he had spent the four winter months beginning with December in Florida. He was not on vacation there. He performed his duties as president in Florida quite as effectively as though he were at the company's office in Boston. He received reports from the three plants of the petitioner corporation and was in telephonic communication with the several plant executives almost daily. Section 23 of the Internal Revenue Code provides in part as follows: In computing net income there shall be allowed as deductions: (a) Expenses. - (1) In *318 General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered. * * * Regulations 103 provide in part as follows: SEC. 19.23 (a)-6. Compensation for personal services. - Among the ordinary and necessary expenses paid or incurred in carrying on any trade or business may be included a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. This test and its practical application may be further stated and illustrated as follows: * * * * *
(2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent *319 compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. The petitioner has always been under the domination and control of George M. Thompson. He was responsible for its organization. He and his family have always controlled a majority of its stock and he has always been its president. He has not only determined the policies of the corporation but also the amount of the compensation of the officers and employees, and settled all questions relating to the conduct of the corporation. To prove that the amounts paid by the petitioner to its president and treasurer were not in excess of reasonable compensation for services rendered the petitioner has introduced into evidence charts prepared by a business analyst, which, it is claimed, show that such amounts were not in excess of amounts paid by comparable *320 companies for such services. The charts also show the relationship of the total selling, general, and administrative expenses to net income of the petitioner and comparable companies. The claim is made that these studies all point to the reasonableness of the deductions claimed by the petitioner. We have carefully studied the above data. We do not find them helpful in deciding the issue presented. Most of the comparatives are steel companies which are engaged in different lines of business from those of the petitioner. The petitioner's contention that we must consider the reasonableness of the entire amounts paid to the petitioner's executive officers - president, treasurer and vice-president - as a unit must be rejected. Excessive compensation paid to one officer may not be offset by deficient compensation paid to another officer. We consider first the claim of the petitioner to the deduction from gross income of $72,500 and of $100,000 paid as compensation for services performed by the petitioner's president, George M. Thompson. The evidence shows that during the years 1918 and 1919 Thompson was receiving a salary of $50,000 per year. For the years 1920 and 1921 he received *321 a salary of $35,000. He gave up his position some time in the year 1922 for the purpose of organizing the petitioner corporation. From the time that he gave up his prior position until 1924 he received no salary. It was his intention to take a salary as soon as the petitioner corporation was on its feet and able to pay a salary but the amount received in 1924 was only $7,600, and for each of the years 1925 and 1926, $12,000. It was not until 1930 that he took a salary of $50,000. Bonuses were paid not only to the petitioner's president and treasurer, but also to some other principal employees. On February 4, 1936, the petitioner's board of directors passed the following resolution: Upon motion duly made and seconded, it was VOTED that until further vote of the Board of Directors, the corporation pay to the president and treasurer each as compensation for his services, a salary of $25,000 per year, payable monthly. The evidence unmistakably shows that George M. Thompson was a man of genius. Not only was he an able executive with marked ability to select able assistants but he knew the steel wire and cold rolled strip steel business from the ground up. Furthermore, he had the *322 ability to develop new uses for the products of his company, new methods of manufacture which greatly reduced the manufacturing costs, and had ability to solve problems put up to him by his customers. Where, for instance, a special form of steel wire was needed for a particular business he was able to make the product. As a result of his endeavors the petitioner became practically the sole supplier of different lines of steel wire and cold rolled strip steel. The petitioner corporation succeeded in building up a large business during the depression years when many of its competitors went into bankruptcy. The success of the petitioner corporation was very largely due to George M. Thompson's efforts. The entire amount of compensation received by George M. Thompson for his services to the petitioner from 1923 to the close of 1941 was $764,010, or at the rate of $40,211 per year. The respondent has determined that reasonable compensation for George M. Thompson's services for each of the years 1940 and 1941 was $65,000 per annum and that the amounts paid in excess constitute excessive compensation which does not amount to an ordinary and necessary business expense. Even if $65,000 *323 constituted adequate compensation for 1939, it does not follow that that amount was adequate compensation for each of the years 1940 and 1941. The evidence shows that Thompson's duties and responsibilities during those years were much greater than in prior years. It was in those years that the Chicago plant came into full operation. Thompson devoted a great deal of time and attention to the Chicago plant. The only amount ever invested in the petitioner's business by the stockholders (except for an issue of preferred stock in or about 1925, which was entirely retired out of earnings within about five years), was $300,000. Upon each $100 originally invested a stockholder received cash dividends from 1934 to 1941, inclusive, of $207 per share and at the end of 1940 his $100 investment had a book value of $948.52. The book value of each of the 9,000 shares at the close of 1941 was one-third of that amount because of the payment of a 200 percent stock dividend in 1933. This is a remarkable record. We have no doubt that the services rendered by George M. Thompson to the petitioner for the calendar years 1940 and 1941 were worth $72,500 and $100,000, respectively. We conclude upon the *324 entire evidence that the amounts deducted by the petitioner for compensation for George M. Thompson for the year 1940 and 1941 were not in excess of reasonable amounts as compensation for services actually rendered. The situation with regard to the compensation paid to Barton J. Thompson, the son of George M. Thompson and treasurer of the petitioner for the years 1940 and 1941, is entirely different from that relating to the amount of compensation paid to George M. Thompson. The respondent has determined that he was not entitled to the payment of a greater amount of compensation for services than was paid to the executive vice-president, William B. Durkee. Barton J. Thompson became an employee of the petitioner corporation in 1932 upon graduation from Norwich University at the age of 24. He was given a position in the sales department. In 1934 and 1935 he was paid compensation in excess of the amount paid his father and for subsequent years through 1940 he was paid the same compensation as his father, or a greater amount. Barton J. Thompson was referred to by Durkee in his testimony before the Tax Court as a "natural-born salesman." It is contended that his services were of great *325 value to the petitioner; that he succeeded in selling to certain consumers steel wire and cold rolled strip steel which his father and Durkee had been unable to obtain as customers. His father also testified that he was largely responsible for the building of the Chicago plant which his father considered as the greatest contribution to the corporation that had ever been made. It is in evidence, however, that George M. Thompson had in mind the building of the Chicago plant many years prior to the time that the plant was built. Apparently all that Barton contributed to the building of the plant was to prod his father to carry out the building plan which he long had in contemplation. It appears to us to be a fact that Barton was the beneficiary of his father's generosity. Barton was an only son. His father always planned that he should inherit the business. It was with this thought in view that the trust was created by his father in 1931. The creation of the trust was admittedly for the purpose of saving income taxes. In 1936 the trust was modified whereby Laura Thompson, the mother of Barton, became a beneficiary of that trust. The large payments of compensation to Barton were apparently *326 for the purpose of dividing the income tax liabilities of the three members of the Thompson family approximately between them. Although it is contended that Barton was a wonderful salesman it is quite apparent that there was a demand for the petitioner's products which had been created prior to the time that Barton became identified with the corporation. Barton went into the military service on February 1, 1942. His services as salesman were not available to the corporation after that date. It appears, however, that the sales for 1942 and subsequent years without his services were approximately the same as for 1941. The salary of Barton was fixed by a resolution of the board of directors in 1936 at $25,000 a year. We think that this was ample compensation for services rendered during each of the years 1940 and 1941. The excess amounts paid him were not, in our opinion, legal deductions for gross income. Decision will be entered under Rule 50.